## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RICHARD FERRACCI** | * | **CASE NO.: 93-3525 (MD)(1)** |
| **Personal Representative of the Estate of** | * | **CASE NO.: MDL-875 (PAE)** |
| **JOAN G. OVER** | * | |
| **405 Winterberry Court** | * | |
| **Edgewood, Maryland 21040** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **JOHN CRANE-HOUDAILLE, INC.,** | * | |
| **f/k/a CRANE PACKING COMPANY** | * | |
| **Morton Grove, Illinois 60053** | * | |
| | * | |
| **Serve On:** | * | |
| | * | |
| **President** | * | |
| **John Crane-Houdaille, Inc.** | * | |
| **6400 Oakton Street** | * | |
| **Morton Grove, Illinois 60053** | * | |
| | * | |
| **and** | * | |
| | * | |
| **DURABLA MANUFACTURING CO.** | * | |
| **821 Lancaster Avenue** | * | |
| **Strafford-Wayne, PA 19087** | * | |
| | | |
| **Serve On:** | * | |
| | * | |
| **President** | * | |
| **821 Lancaster Avenue** | * | |
| **Strafford-Wayne, PA 19087** | * | |
| | * | |
| **and** | * | |
| | * | |
| **GENERAL REFRACTORIES COMPANY** | * | |
| **600 Grant Street, Room 3000** | * | |
| **Pittsburgh, Pennsylvania** | * | |
| | * | |
| **Serve On:** | * | |
| | * | |

**(1)**

**Corporation Trust, Inc.**              *
**300 E. Lombard St., Suite 1400**    *
**Baltimore, Maryland 21202**       *
                                 *
**and**                              *
 *

**OWENS-ILLINOIS GLASS CO.,**   *
**f/k/a OWENS-ILLINOIS, INC.**    *
**P.O. Box 1035**               *
**Toledo, Ohio 43604**          *
 *

**Serve On:**                      *
 *

**Corporation Trust, Inc.**         *
**300 E. Lombard St., Suite 1400**  *
**Baltimore, Maryland 21202**     *
 *
**and**     *
 *

**RAPID AMERICAN CORPORATION**  *
**(As Successor-in-Interest to**    *
**The Philip Carey Manufacturing**   *
**Company and Glen Alden Corp.)**   *
**723 Fifth Avenue**          *
**New York, New York**       *
 *

**Serve On:**         *
 *

**Rapid American Corporation**    *
**C/O CFC Networks**        *
**1013 Centre Road**        *
**Wilmington, Delaware 19805**   *
 *
**and**    *
 *
 *

**CBS CORPORATION as Successor to** *
**Westinghouse Electric Corporation** *
**Westinghouse Building, Gateway Center** *
**Pittsburgh, PA 15222**     *
 *
**Serve On:**     *
 *
**The Prentice-Hall Corporation System, MD** *

**(2)**

**11 E. Chase Street**                          *
**Baltimore, Maryland 21202**                   *
                                                *
**and**                                         *
                                                *
**J. H. FRANCE REFRACTORIES CO.**               *
**1944 France Road**                            *
**Snow Shoe, PA 16874**                         *
                                                *
**Serve On:**                                   *
                                                *
**William A. France, Jr.,**                     *
**President**                                   *
**1944 France Road**                            *
**Snow Shoe, PA 16874**                         *
                                                *
                                                *
           **Defendants**                       *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## AMENDED COMPLAINT AND PRAYER FOR JURY TRIAL

Richard Ferracci, Personal Representative of the Estate of Joan G. Over, deceased plaintiff, sues the various Defendants captioned above who are or have been manufacturers and/or suppliers of asbestos-containing products (hereafter sometimes referred to collectively as "Asbestos Suppliers"), and in support thereof allege:

### Claim Against Asbestos Suppliers

### JURISDICTION

Jurisdiction of this Court is founded on 28 U.S.C. §1442(a)(1).

1.     Westinghouse Electric Corporation noted the removal of this civil action from the Circuit Court of Maryland for Baltimore City to the United States District Court for the District of Maryland alleging that the District Court had proper jurisdiction to adjudicate claims with respect to persons acting under an officer or agency of the United States, pursuant to 28 U.S.C. §1442.

2.     Plaintiff's attorneys filed a motion to remand to the Circuit Court of Maryland for Baltimore

City. However, the District Court denied plaintiff's motion. In denying plaintiff's motion, the District Court found removal by Westinghouse Electric Corporation proper under 28 U.S.C. §1442(a)(1).

3.     Plaintiff would also sue Amatex Corporation, incorporated under the laws of the Commonwealth of Pennsylvania having its principal place of business in Norristown, Pennsylvania; Armstrong World Industries; incorporated under the laws of the State of Pennsylvania having its principal place of business in Lancaster, Pennsylvania; Forty-Eight Insulations, Inc., incorporated under the laws of the State of Illinois having its principal place of business in Aurora, Illinois; The Wallace and Gale Company, incorporated under the laws of the State of Maryland having its principal place of business in Maryland; Standard Insulation, Inc., incorporated under the laws of the State of Missouri having its principal place of business in Missouri; Nicolet, Inc., incorporated under the laws of the Commonwealth of Pennsylvania having its principal place of business in Pittsburgh, Pennsylvania; Eagle-Picher Industries, Inc., incorporated under the laws of the State of Ohio having its principal place of business in Cincinnati, Ohio; Celotex Corporation, incorporated under the laws of the State of Delaware having its principal place of business in Tampa, Florida; Keene Corporation, incorporated under the laws of the State of Delaware having its principal place of business in New York, New York; H. K. Porter Company, incorporated under the laws of the State of Delaware having its principal place of business in Pittsburgh, Pennsylvania; Southern Textile Corporation, formerly known as Southern Asbestos Corporation, incorporated under the laws of the State of Delaware having its principal place of business in Charlotte, North Carolina; and Raymark Industries, Inc., formerly known as Raybestos-Manhattan, Inc., incorporated under the laws of the State of New Jersey having its principal place of business in Trumball, Connecticut; Owens

**(4)**

Corning Fiberglas Corp., incorporated under the laws of the State of Delaware having its principal place of business in Toledo, Ohio; Pittsburgh Corning Corp., incorporated under the laws of the Commonwealth of Pennsylvania having its principal place of business in Pittsburgh, Pennsylvania; G.I. Holdings, Inc., f/k/a The Ruberoid Company; incorporated under the laws of the State of New Jersey having its principal place of business in New Jersey; however, each of these potential defendants has filed a Petition for Relief under Chapter 11 of the Bankruptcy Code and, pursuant to 11 U.S.C. Section 362(a), institution of actions against these companies is stayed, but for which Plaintiff would have named them as Defendant Asbestos Suppliers.

## CLAIM ONE - STRICT LIABILITY

4.    Defendants, and each of them, at all times relevant hereto, were miners, manufacturers, processors, importers, converters, compounders, merchants and/or suppliers of asbestos, insulation materials and/or asbestos-containing products (hereinafter referred to as "asbestos products") who, acting by and through their servants, agents and employees, caused such asbestos products to be sold and placed in the stream of commerce.

5.    Plaintiff, as Personal Representative of the estate of the decedent, is empowered to commence and prosecute this action as one which the decedent could have commenced and prosecuted and to recover all damages recoverable by Plaintiff's decedent, had she survived, and, in addition thereto, funeral and other incidental expenses as allowable by law.

6.    Over the course of years, Plaintiff's decedent, Joan G. Over, since approximately 1967, was married to a steelworker employed in the steelmaking industry.  During this employment, Plaintiff's decedent's husband was required to work with and around asbestos products which were manufactured or supplied by each of the Defendants. Plaintiff's decedent would launder the asbestos-

covered clothing worn by her husband.

7.    The Defendants'  asbestos products were defective in design and/or construction in that they contained harmful, deleterious, carcinogenic, and otherwise inherently and latently dangerous asbestos fibers which unreasonably endangered the life and health of the ultimate users thereof and of persons in the position of Plaintiff's decedent.  Defendants placed their asbestos products on the market knowing that they would be used without inspection for such defects.  Defendants, and each of them, had actual knowledge of the hazards associated with exposure to their asbestos-containing products, and had actual knowledge of their products'  defect and their potential for harm. Nevertheless, Defendants, and each of them, acted with conscious or deliberate disregard of the foreseeable harm resulting from that defect.  Additionally, Defendants, and each of them, willfully refused to know and failed to make reasonable inquiry with a conscious purpose to avoid learning the truth as to the hazards associated with exposure to the dust created in the use of their asbestos-containing products.

8.    The Defendants'  asbestos products were defective in design and/or construction as alleged in the above paragraph and Defendants failed to provide warnings, adequate warnings, or instructions about the dangers, risks and harm inherent in their asbestos products.

9.    The Defendants'  asbestos products were incapable of being made safe for their ordinary and intended use and purpose and Defendants failed to provide warnings, adequate warnings or instructions about the dangers, risks and harm inherent in their asbestos products.

10.    At the time each of the Defendants manufactured, sold, delivered and were otherwise in possession of the aforesaid asbestos products, such products were expected to, and did, reach Plaintiff's decedent in a condition without substantial change from that in which such products were

when within the possession of Defendants.

11.    Plaintiff's decedent, unaware of the defective and unreasonably dangerous condition of the Defendants' asbestos products, and at a time when such products were being used for the purposes for which they were intended, was exposed, in the course of his employment as a steelworker, to Defendants' asbestos products.

12.    As a direct and proximate result of the above-described exposure to Defendants' asbestos products, Plaintiff's decedent developed and suffered from lung cancer and asbestos lung disease and died on June 24, 1999 as a result thereof.

13.    As further direct and proximate results of the exposure and injuries described above, Plaintiff's decedent suffered great physical, emotional and mental pain, anxiety, anguish, embarrassment and humiliation, and lost the ability to enjoy life as he otherwise would if he had not suffered from an asbestos-related disease. Plaintiff's decedent required medical treatment and incurred great expenses for medical and hospital care and treatment.

**WHEREFORE,** Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers, in the amount of Two Million Dollars ($2,000,000.00) compensatory damages and Four Million Dollars ($4,000,000.00) punitive damages.

## CLAIM TWO - BREACH OF WARRANTY

14.    Plaintiff, Richard Ferracci, adopts and incorporates by reference all relevant paragraphs of this Complaint as if fully set forth herein.

15.    Defendant Asbestos Suppliers, and each of them, impliedly warranted that their asbestos products were of good and merchantable quality and fit and suitable for the particular use for which said products were intended. The implied warranty was breached in that harmful, poisonous,

deleterious and inherently dangerous asbestos dust and fibers were released into the air and atmosphere wherein Plaintiff's decedent carried out her duties using said products.  As a direct and proximate result of the breach of such warranty, Plaintiff's decedent developed lung cancer and asbestos lung disease, without negligence or want of due care on the part of Plaintiff's decedent contributing thereto.

**WHEREFORE,** Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers, in the amount of Two Million Dollars ($2,000,000.00) compensatory damages and Four Million Dollars ($4,000,000.00) punitive damages.

### CLAIM THREE - NEGLIGENCE

16.    Plaintiff, Richard Ferracci, adopts and incorporates by reference all relevant paragraphs of this Complaint as if fully set forth herein.

17.    Defendant Asbestos Suppliers, and each of them, knew, or in the exercise of reasonable care should have known, that persons employed as steelworkers and tradesmen, as Plaintiff's decedent was, would be required to and would, in fact, come into contact with and work in close proximity to their asbestos products, which the Defendants knew, or in the exercise of ordinary care should have known, were health and life-threatening.

18.    Defendants, and each of them, negligently, willfully, wantonly, recklessly and with gross indifference for the rights of persons in Plaintiff's decedent' s position, omitted and failed, among other things:

(a)    To properly design and/or construct their asbestos products in that they contained harmful, deleterious, carcinogenic, and otherwise inherently and latently dangerous asbestos which unreasonably endangered life and health;

**(8)**

(b)    To advise Plaintiff's decedent of the dangerous characteristics of their asbestos products;

(c)    To provide Plaintiff's decedent with the knowledge as to what would be reasonably safe and sufficient safeguards, including wearing apparel and protective and monitoring equipment, which could have been employed to protect Plaintiff's decedent from the harmful exposure to their asbestos products;

(d)    To place any warnings or, alternatively, adequate warnings, on their asbestos products or containers thereof to advise the users of the products and those exposed thereto of the dangers of exposure to and breathing of asbestos fibers and dust;

(e)    To package and contain their asbestos products in a manner to lessen or eliminate the inhalation of asbestos fibers during the installation and removal thereof;

(f)    To take reasonable precautions or to exercise reasonable care to publish, adopt and communicate safety plans and safe methods of handling, installing and removing their asbestos products and otherwise to recommend methods to improve the work environment; and

(g)    To develop and distribute asbestos-free products.

19.    As a proximate result of the negligence, recklessness and gross indifference of Defendant Asbestos Suppliers, Plaintiff's decedent developed lung cancer and asbestos lung disease and died on June 24, 1999 as the result of his exposure to the defendants' asbestos products, without negligence or want of due care on the part of Plaintiff's decedent contributing thereto.

**WHEREFORE,** Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers in the amount of Two Million Dollars ($2,000,000.00) compensatory damages and Four Million Dollars ($4,000,000.00) punitive damages.

**(9)**

## CLAIM FOUR - FRAUD

20.     Plaintiff, Richard Ferracci, adopts and incorporates by reference all relevant paragraphs of this Complaint as if fully set forth herein.

21.     At all times relevant hereto, each and every Defendant Asbestos Supplier aided, assisted and encouraged the distribution and sale of their products, including those complained of herein, without adequate warnings, other safety precautions or change in design, by the participation in, support of and the utilization of industry-wide and/or parallel product research and development, exchanges of information, marketing, advertising, promotion and/or other similar endeavors, all of which such effort inured to the joint and mutual benefit of all such suppliers in the wide and continued distribution, sale and use of Defendants'   products.

22.     Since a time prior to exposure of the Plaintiff's decedent to the Defendants'  asbestos products, Defendants, and each of them, have been possessed with substantial medical and scientific data by which these Defendants clearly knew that their asbestos products were, or were likely to become, hazardous to the life, health and safety of persons in the position of Plaintiff's decedent who were exposed to their products.

23.     Nevertheless, prompted by pecuniary motives, each of the Defendant Asbestos Suppliers, individually and collectively, failed and refused to act upon such medical and scientific data, to warn users of their products and those who worked in close proximity thereto of the life and health-threatening dangers of exposure to and the breathing of asbestos fibers and dust, and to take such other reasonable precautions necessary to lessen the dangers and potentially lethal and dangerous characteristics of their asbestos products.  Defendants, in wanton and reckless disregard for human life and health, deliberately, intentionally and purposely withheld and concealed such information

**(10)**

from users of and those exposed to their products.

24.    Plaintiff's decedent, unaware of the dangers to life and health resulting from exposure to Defendants' asbestos products and not possessing the degree of technical knowledge and expertise of the Defendants concerning asbestos and its use, continued to work with and around their products and was deprived by the above-described acts and omissions of Defendants of the free and informed opportunity to remove herself from exposure to Defendants' asbestos products and otherwise to protect herself from exposure thereto. The Defendants' fraudulent conduct of concealment was a direct and proximate cause of Plaintiff's decedent's lung cancer and asbestos lung disease.

    **WHEREFORE,** Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers in the amount of Two Million Dollars ($2,000,000.00) compensatory damages and Four Million Dollars ($4,000,000.00) punitive damages.

## CLAIM FIVE - CONCERT OF ACTION

25.    Plaintiff, Richard Ferracci, herein adopts and incorporates by reference all relevant paragraphs of this Complaint as if fully set forth herein.

26.    At all times relevant hereto, each and every Defendant Asbestos Supplier aided, assisted and encouraged the distribution and sale of asbestos products, including those complained of herein, without adequate warnings, other safety precautions or change in design, by the participation in and the utilization of industry-wide and supported and/or parallel product research and development, exchanges of information, marketing, advertising, promotion and/or other similar endeavors; all of which such efforts inured to the joint and mutual benefit of all such suppliers in the wide and continued distribution, sale and use of Defendants' asbestos products.

27.    The above-described concert of action of the Defendants was a direct and proximate cause

**(11)**

of the Plaintiff's decedent's lung cancer, asbestos lung disease and death on June 24, 1999.

**WHEREFORE,** Plaintiff requests judgment against each and every one of the Defendant Asbestos Suppliers in the amount of Two Million Dollars ($2,000,000.00) compensatory damages and Four Million Dollars ($4,000,000.00) punitive damages.

## CLAIM SIX - CONSPIRACY

28.   Plaintiff, Richard Ferracci, herein adopts and incorporates by reference all relevant paragraphs of this Complaint as if fully set forth herein.

29.   Defendants formed confederacies as hereinafter described entered into agreements or tacit understandings to individually, jointly and in conspiracy with each other market asbestos products by unlawful means including, inter alia, their tortious conduct of suppressing their knowledge of the dangers of asbestos and of placing into the stream of commerce, without adequate testing or warnings, their asbestos products, which were unreasonably dangerous, ultrahazardous, deleterious, carcinogenic and potentially deadly.

30.   Defendants, individually, jointly and in conspiracy with each other knowingly committed the tortious and contractual acts described in this Complaint, as well as other similar wrongs, in furtherance of their agreement or understanding to market asbestos products in an unlawful manner.

31a.   As to Defendants A. C. and S, Inc., Armstrong World Industries, Inc., Asbestospray Corporation, Carey Canada, Inc., The Celotex Corporation, Eagle Picher Industries, Inc., Fibreboard Corporation, GAF Corporation, Georgia Pacific Corporation, H.K. Porter Company, Inc., Keene Corporation, Metropolitan Life Insurance Company, National Gypsum Company, Owens-Corning Fiberglass Corp., Owens-Illinois Glass Co., Pittsburgh Corning Corporation, The Ruberoid Company, Smith & Kanzler Corporation, Southern Textile Corporation, Turner and Newall PLC.,

United States Gypsum Co., and U. S. Minerals Products Company:

31b.    Plaintiff alleges that the defendant knew beginning in the early 1930's of the extreme dangers to those who were exposed to asbestos dust and fibers and that this knowledge continued into the 1940's 1950's and 1960's and later.  Instead of warning representatives and other similar workers as to the dangerous nature of their asbestos and asbestos products, the defendants conspired with each other to hide the dangers, hide all information as to the dangers, and indeed to keep workers and others ignorant or at least unknowing as to the dangers of asbestos.

31c.    Plaintiff alleges and will prove that the Defendants, hereinafter sometimes referred to as "conspirators" or "conspiring Defendants" conspired amongst themselves and with other manufacturers, some of whom may presently be in bankruptcy, and distributors to injure the Plaintiff's decedent in the following fashion:

31d.    In 1928, the Eagle Picher Lead Co. through its General Manager, George Potter, became associated with the Tri-State Operators Clinic at Picher, Oklahoma.  This clinic was run jointly by co-conspirator Metropolitan Life Insurance Company and others.  Dr. Sayers of the U. S. Bureau of Mines and Dr. Anthony J. Lanza, employee and/or agent of the Metropolitan Life Insurance Company were physicians associated with the clinic.  Throughout 1930 and thereafter, the Eagle Picher Lead Co. remained associated with the clinic.  On May 23, 1930, Dr. F.V. Meriwether, another physician associated with the clinic, informed Dr. Anthony J. Lanza, Assistant Medical Director of the Metropolitan Life Insurance Company that Mr. O. N. Wampler, Safety Director of the Eagle Picher Lead Company expressed concern over Eagle Picher Lead Co.'s lack of supervision of manpower which ultimately permitted industrial diseases to become part of the compensation laws.  Mr. Wampler expressed particular concern over asbestos legislation.  Eagle Picher, by and

through its agents, servants and/or employees with its co-conspirators intentionally failed to warn workers and others of the dangers of exposure to asbestos which it and others possessed at that time.

31e.    In 1930, Metropolitan Life Insurance Company, through its agent, Dr. Anthony J. Lanza, along with Dr. Frank Pedley conducted a study of 195 Quebec asbestos miners.  Forty-two cases of asbestosis were identified among the 195 men examined, but the results were never published in the medical literature.  In 1939, Dr. Anthony J. Lanza published an article in the American Review of Tuberculosis, Industrial Dusts and the Mortality from Pulmonary Disease, in which he stated that the asbestos cases described therein originated in textile and other asbestos fabricating plants and not in connection with asbestos mining.

31f.    In 1933, Metropolitan Life Insurance Company, insurer of co-conspirator Johns Manville Company, through its agent, Dr. Anthony J. Lanza, advised physicians at the Johns Manville, Waukegan, Illinois plant that it was doubtful whether the asbestos hazard was sufficient to justify warning posters that asbestos was hazardous to health.  According to Dr. Lanza this was especially true in light of the extraordinary situation.

31g.    In the early 1930's several asbestos manufacturers were subjected to compensation suits by individuals employed in their factories and mills.  These suits provoked defendant Johns Manville and now bankrupt co-conspirator Raymark Industries, Inc. (Raybestos-Manhattan, Inc.) to conduct research into the effects of asbestos on human beings and animals.  Numerous studies of experimental and statistical nature were conducted by various co-conspirators and were either never published in the medical literature, as previously alleged or which when published, were subjected to substantive editing by members of the conspiracy.

31h.    Beginning in approximately 1934, Johns Manville Corporation, through its agents, Vandiver

Brown and attorney J. C. Hobart, and co-conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. D. Rohrbach, suggested to Dr. Anthony Lanza, Associate Director of co-conspirator, Metropolitan Life Insurance Company (insurers of Manville and Raybestos) that Dr. Lanza edit a previously completed study on asbestos and publish a study which would affirmatively misrepresent a material fact about asbestos exposure; that is, the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Lanza's description of asbestosis as "fatal"; and through other selective editing that affirmatively misrepresented asbestosis as a disease process less serious than it actually is and was known to be. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935 in the United States Public Health Service Reports. The conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville and Raybestos.

31i.    In 1934, F.W. Sherwood, Vice President of Owens-Illinois, and Roger Hitchins presented a request to the Mellon Institute of Industrial Research from various manufacturers that the Mellon Institute sponsor a symposium on industrial disease problems. In December of 1934, Dr. E. R. Werdlein, Director of the Mellon Institute of Industrial Research, wrote a letter to, among others, Metropolitan Life Insurance Company and Johns Manville outlining various types of dust diseases known generally as pneumoconiosis and including asbestosis. Following this letter a symposium of dust problems was held on January 15, 1935 in Pittsburgh, Pennsylvania. Among those present were Vandiver Brown of Johns Manville, A. J. Lanza, Metropolitan Life Insurance Company and A. C. Hirth, an attorney for Owens-Illinois Glass Company. In January of 1935, Vandiver Brown wrote "An impressive list of experts" specializing in various aspects of the dust problem attended

the meeting and delivered addresses which "together with open discussion following them" revealed:

> ...The very menacing character of the problem,
> its complex nature, the uncertainties attending
> most of its aspects and the necessity of some
> form of united action by the afflicted industries.

Participants in the symposium discussed the problems related to (1) obtaining expert testimony; (2) jury verdicts; (3) "problems of ventilation, dust collecting and elimination, and respiratory devices" and (4) "establishing of standards (a) for dust counting and particle size determination, (b) for the taking of x-rays and diagnostic use, and (c) for the interpretation of the markings on the films so produced."

31j.    At the conclusion of the symposium a committee was elected for the purpose of "formulation of ways and means to bring about effective cooperation of some character between the various industries for meeting and combating those phases of the dust problem common to all."  A.W. Sherwood from Owens-Illinois and Vandiver Brown from Johns-Manville were elected to various committees.  Dr. Lanza of Metropolitan Life Insurance was a central figure in the formation of what became known as the Industrial Hygiene Foundation and also became Chairman of the Medical Committee of the Foundation.  The Industrial Hygiene Foundation performed confidential industrial and medical surveys for the Asbestos Textile Institute, as hereinafter alleged, and also performed an epidemiological study of lung cancer in asbestos mines for the Quebec Asbestos Mining Association and ultimately altered the final report to delete substantive data on the prevalence of lung cancer in asbestos miners, all as hereinafter alleged.

31k.    In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose

liabilities have been assumed by H. K. Porter Company), Union Asbestos and Rubber Company, United States Gypsum Company, the Thermoid Company and Southern Asbestos Company (whose liabilities have been assumed by H. K. Porter Company) entered into an agreement with the Saranac Laboratories. Under this agreement, these conspirators acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control in what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact being made at scientific meetings.

31l.    As a result of the aforegoing Saranac Studies, Dr. Leroy Gardner, in 1943, prepared a monograph on human asbestosis which suggested evidence that asbestosis may precipitate the development of lung cancer. On October 24, 1946, Dr. Leroy Gardner, the primary scientist and researcher in charge of the Saranac Laboratory studies unexpectedly died.

31m.    In 1946 Dr. Anthony Lanza was elected to the Board of Trustees of the Saranac Laboratory, Trudeau Foundation but maintained his position as Medical Director for Metropolitan Life Insurance Company. Thereafter, on numerous occasions signatories of the 1936 agreement began to enlist the services of Dr. Lanza to have an edited report of Dr. Gardner's studies published.

31n.    On January 21, 1947, Dr. Lanza met with executives of one of the co-conspirators of Johns Manville to devise a plan to get Dr. Gardner's Saranac studies published. During the meeting Vandiver Brown called attention to the editorial control of the asbestos company sponsors over any publication and of the importance of not including any objectionable material from the conspirators'

point of view such as the relationship between asbestos dust and cancer which Dr. Gardner had made in his monograph or outline on human asbestosis.

31o.    On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns Manville Corporation:  American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H. K. Porter Company), Union Asbestos and Rubber Company and United States Gypsum Company.  U. S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns Manville to represent its interest at the meeting and to take action on its behalf.

31p.    At this November 11, 1948 meeting, these co-conspirators and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936.  Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical view of the then-existing standards of dust exposure for asbestos and asbestos products.

31q.    At this meeting, these co-conspirators intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published same in the medical literature as edited by Dr. Arthur Vorwald.  These defendants thereby fraudulently misrepresented the risks of asbestos exposure to the public in general and the class of persons exposed to asbestos, including the Plaintiff's decedent.

31r.    As a result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in the Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene and Occupational Health in 1951 in a form that stressed those portions of Dr. Gardner's work that the conspirators wished stressed, but which omitted references to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the risks.  The conspirators affirmatively and deliberately disseminated this misleading Vorwald publication to university libraries, government officials, agencies and others.

31s.    Such action constituted a material affirmative misrepresentation of the total content of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

31t.    The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):  Johns Manville Corporation, Carey Canada, Inc., and Philip Carey Company, (whose liabilities have been assumed by Celotex), National Gypsum Company, and Turner & Newall, and H. K. Porter Company.  These conspirators, members of the Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Leroy Gardner published by Arthur Vorwald in the AMA Archives of Industrial Health in 1951.  Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns Manville's membership of the Q.A.M.A., as well as correspondence from co-conspirators dated:

10/29/47 from A. R. Fisher to J. P. Woodard

11/26/47 from J. P. Woodard to Vandiver Brown

3/6/48 from George K. Foster to J. P. Woodard

10/15/48 from J. P. Woodard to Vandiver Brown

**(19)**

3/8/49 from Vandiver Brown to Ivan Sabourin

3/21/51 from Vandiver Brown to Ivan Sabourin

9/6/50 from J. P. Woodard to G. K. Foster,

and all indicating close monitoring of the editing process by Q.A.M.A.' s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.' s members.

31u.    Defendants who were members of the Q.A.M.A. as described above, began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

31v.    This plan of misrepresentation and influence over the medical literature began in or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos.  After a preliminary report authored by Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

31w.  As a result of the termination of this study, these defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators'  agents, K. W. Smith, M.D., Paul Cartier, M.D., A. J. Vorwald, M.D., A. J. Lanza, M.D., Vandiver Brown and Ivan Sabourin, said misrepresentations being directed

to inter alia, U. S. Government officials, Canadian government officials, U. S. National Cancer Institute, other medical organizations and the general public, including Plaintiff's decedent.

31x.    Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer.  In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a worker's chances of incurring lung cancer.

31y.    The Q.A.M.A. defendant conspirators/members thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out of agents of the Q.A.M.A.  The published version of this study contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a conclusion known by the defendant conspirators to be patently false.

31z.    By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, these Q.A.M.A. defendant conspirators affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

31aa.   In approximately 1958, the Q.A.M.A. defendant conspirators publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

31bb.   The fraudulent misrepresentations beginning in 1946 as elaborated above and continuing with the publication of the 1958 Braun/Truan study influenced the standards set for threshold limit values and prevented the lowering of the threshold limit value because of a cancer risk associated with asbestos inhalation.

31cc.   In 1967, Q.A.M.A. conspirators determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

31dd.   The following conspirators were members of the Magnesia Insulation Manufacturers Association which later changed its name to the National Insulation Manufacturers Association (NIMA):  Philip-Carey Corporation (whose assets and liabilities have been assumed by Celotex), Johns Manville, GAF Corporation, The Ruberoid Company, Owens-Corning Fiberglas, Eagle Picher Industries, Inc., Pittsburgh Corning Corporation, Fibreboard Corporation and Keene Corporation.

31ee.   In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual.  This manual falsely and fraudulently misrepresented that asbestos-containing products were easily cut and fit and offered no hazard to workers who used these products.

31ff.   In May, 1968 John Vyverberg of Owens-Corning Fiberglas, along with Cliff Sheckler of Johns Manville, addressed a Southwestern Insulation Contractors Association (SWICA) meeting concerning asbestos related health hazards.  Pittsburgh Corning's R. E. Fuhs reported on that meeting in a 5/28/68 memorandum to R. E. Buckley and stated:

> During the recent SWICA meeting in Biloxi, Mississippi, a great deal of time was spent discussing the health hazards imposed on workers through the use of asbestos in high temperature insulation.
>
> A program was presented by NIMA with Cliff Sheckler of Johns Manville and John Vyverberg of Owens-Corning bringing the group in attendance up-to-date on the problem and what NIMA is doing to counteract some very adverse activity at the present time.
>
> It appears, Bob, that the problem of health hazards amongst asbestos workers is rapidly becoming critical (30% of current asbestos workers have pulmonary problems) and that a strong united front is necessary to preserve this industry.  In my opinion, NIMA is doing an excellent job of spotlighting this problem and through research and discreet publicity are probably our best hope of combating this very serious situation.

**(22)**

In 1968, NIMA published a brochure entitled, "Recommended Health Safety Practices for Handling and Applying Thermal Insulation Products Containing Asbestos," that fails to mention asbestosis, lung cancer or mesothelioma.  It states, by way of introduction,

> The modern mass production of hundreds of natural and synthetic materials such as asbestos, has brought the need to protect workers from certain health risks, known or suspected.

This vague reference to "certain health risks" clearly misleads the public including the Plaintiff's decedent by not calling attention to the well established link between asbestos exposure and asbestosis, lung cancer and mesothelioma.  The co-conspirators through their active participation in NIMA, acted in concert with the other NIMA members to distort, suppress and misrepresent information relating to health hazards associated with asbestos.

The following conspirators, among others, were members of the trade organization known as the Asbestos Textile Institute (ATI):  Raybestos-Manhattan, Johns Manville, Southern Asbestos Company/H. K. Porter, Keasby & Mattison, individually and through its alter-ego Turner & Newall, and National Gypsum Company.

31gg.  In 1947, these conspirators, members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis, which suggested re-evaluation of the then-existing threshold limit values for asbestos exposure.  These defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the existing threshold limit value was acceptable.  Thereafter, these defendant conspirators withheld additional material information on the dust standards from the American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of threshold limit values for asbestos exposure.

**(23)**

31hh.   In 1953, conspirator National Gypsum, through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the product.  National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

31ii.   In 1955, conspirator Johns Manville, through its agent Kenneth Smith, caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers."  This published study materially altered the results of an earlier study in 1949 concerning the same set of workers.  This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

31jj.   In 1955, the National Cancer Institute held a meeting at which conspirator Johns Manville, individually and as an agent for other alleged co-conspirators, affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer when, in fact, the conspirators were in secret possession of several studies which demonstrated that positive evidence did exist.

31kk.   In 1957, the aforementioned conspirators, members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

31ll.   In 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr.

(24)

Irvin J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

31mm. In 1970, through their agents, defendants, the Celotex Corporation and Carey-Canada, affirmatively misrepresented that it had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these defendants.

31nn. All conspirators identified above approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and A. J. Lanza, acting on behalf of Metropolitan Life Insurance Company, and all alleged co-conspirators during the dates and circumstances alleged above, acted as agents and conspirators for the other conspirators.

31oo. The acts of the defendant conspirators, as described above, constitute a fraudulent misrepresentation which proximately caused injury to the Plaintiff's decedent in the following manner:

(a)    The material published or caused to be published by the defendants was false and incomplete in that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

(b)    Defendants individually, as member of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

(1)    maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2)    assist in the continued pecuniary gain of the defendants through the sale of their

products;

 (3) influence in the defendants' favor proposed legislation to regulate asbestos exposure; and,

 (4) to provide a defense in lawsuits brought for injury resulting from asbestos exposure.

 (c) Plaintiff's decedent reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products to continue their exposure to asbestos because they believed it to be safe.

 (d) Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended that Plaintiff's decedent rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue his exposure to those products:

 (e) Defendants individually, as members of a conspiracy, and as agents of other co-conspirators are in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiff's decedent had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

 (f) Plaintiff's decedent suffered injury as a direct and proximate result of the acts alleged herein.

31pp. Additionally, Plaintiff further alleges as follows.

31qq. On October 28, 1938 Owens-Illinois and Corning Glass Works entered into an agreement

for the formation of Owens-Corning Fiberglas Corporation. When Owens-Corning Fiberglas was incorporated in 1938 it had an interlocking Board of Directors consisting of seven members, three of whom were designated by Owens-Illinois and three of whom were designated by Corning Glass Works. The seventh member was Harold Boeschenstein who was President of Owens-Corning Fiberglas Corporation since its inception in 1938 and was also on the Board of Directors of Owens-Illinois.

31rr.    As early as March 9, 1937, W. C. Templer, M.D., medical director of Corning Glass Works, one of the parent companies of Owens-Corning Fiberglas Corporation, was aware that asbestos was capable of producing fibrosis of the lung.

31ss.    Additionally, as early as 1941, representatives of Owens-Corning Fiberglas Corporation and Owens-Illinois, Inc. shared information concerning the hazards of asbestos exposure.

31tt.    Despite this knowledge, Owens-Illinois entered into an agreement with Owens-Corning Fiberglas whereby Owens-Corning Fiberglas Corporation became the national distributor of Kaylo products from 1953 to 1958, at which time Owens-Illinois sold the Kaylo product line to Owens-Corning. At least in 1956, Owens-Illinois placed the Owens-Corning Fiberglas logo on some boxes of Kaylo, all of which were sold, then and thereafter without any warnings concerning the dangers of exposure to asbestos-containing products.

31uu.    A. C. and S, Inc. began operating in 1958 under the name Armstrong Contracting and Supply Corporation. It was a wholly owned subsidiary of the Armstrong Cork Company, now known as Armstrong World Industries. A. C. and S, Inc. conspired with the makers of the products it distributed by failing to recommend non-asbestos products and by failing to warn handlers and users of the hazards of asbestos. A. C. and S, Inc. and these manufacturers used their respective positions

in the market place to suppress knowledge of the hazards of asbestos and prevent it from reaching

users of these products such as the Plaintiff's decedent.  A. C. and S, Inc. not only failed to warn of

the dangers despite its knowledge, but also failed to transmit any warnings its suppliers may have

provided.

31vv.   A. C. and S, Inc. particularly conspired with Turner & Newall which exercised great control

over the sales and application of Limpet, an asbestos-containing spray product.  Turner and Newall

shared its longstanding knowledge of the hazards of asbestos with A. C. and S, Inc.  A. C. and S, Inc.

joined Turner and Newall in failing to warn users of Limpet of the dangers and in suppressing Turner

and Newall' s substantial and specific knowledge of the hazards of asbestos.

31ww. A. C. and S, Inc., furthermore, cooperated with its insurance companies and other insurance

companies by settling claims by workmen for injury due to asbestos exposure, thereby preventing

public knowledge of the claims and hazards.

31xx.   Armstrong World Industries conspired with the makers of the products it relabeled and

distributed by failing to recommend non-asbestos products and by failing to warn ultimate building

users of the hazards of asbestos.  Armstrong World Industries and these manufacturers, which

included Baldwin-Ehret-Hill (Keene), Eagle-Picher, Keasbey & Mattison (Turner & Newall and/or

Nicolet) used their respective positions in the market place to suppress knowledge of the hazards of

asbestos and prevent it from reaching users of these products, including the Plaintiff's decedent.

Armstrong not only failed to warn of the dangers despite its knowledge, it also failed to transmit any

warnings these other manufacturers provided to Armstrong.

31yy.   Armstrong Cork (now Armstrong World Industries), in concert with Armstrong Contracting

and Supply Corp., joined forces to suppress information about the asbestos hazards that had

**(28)**

overcome their mutual workforce. Armstrong Cork, Armstrong Contracting and Supply Co. (now A. C. and S, Inc., Inc.), and their insurance carriers suppressed information by making cash settlements to workers who submitted compensation claims.

31zz. In November 1961, Smith and Kanzler and Asbestospray joined forces with Columbia Acoustics and Fireproofing Company, (now U. S. Minerals Products Corp.) and others to organize a trade association to promote the use of asbestos-containing sprayed fiber products.

31aaa. In October, 1965, Baldwin-Ehret-Hill (now Keene) joined the aforementioned group of asbestos spray fireproofing manufacturers comprised of defendant U. S. Mineral Products Company, Asbestospray Corporation and Smith & Kanzler Company. The group was called the Spray Mineral Fibers Manufacturers' Association (SMFMA). The purpose of this organization was to promote the use of the members' asbestos spray products by representing those products to be safe and suitable for use as fireproofing and thermal insulation (contrary to the specific knowledge of the members that asbestos was dangerous). The group sponsored secret asbestos dust tests of the members' products which proved Keene's products to be unreasonably and uncontrollably dusty. The result of the secret asbestos dust studies were shared among the group but were suppressed from the general public as well as from the users, installers and consumers of those products.

31bbb. From its creation, SMFMA was represented actively by counsel who was present at all meetings and wrote or reviewed all minutes for the express purpose of defending against subsequent allegations of conspiratorial activity by the members. Subsequent correspondence revealed:

> Having had some said experience with antitrust investigation and some with trade associations, I think if you are serious about the organization of such an association, it might be highly advisable to have an attorney on hand even at this first meeting, lest everybody get accused later of conspiracy, "phases of the moon," etc.

31ccc.  As the popular press began to regularly publish medical findings in 1965 which established the unquestionable link between asbestos and cancer, Baldwin-Ehret-Hill (Keene) worked with the other members of SMFMA to try to suppress and minimize public recognition of the hazards posed by spray asbestos products in buildings.

31ddd. Moreover, the group acted in express unanimity to discredit and undermine manufacturers who made spray mineral fiber products which did not contain asbestos.  The group further acted in concert to suppress information published by non-asbestos spray mineral fiber manufacturers that would alert the public to the inherent dangers of asbestos spray products due to foreseeable dusting, flaking and cracking.

31eee. Along with the Celotex Corporation, Georgia Pacific Corporation, National Gypsum Company and others, U. S. Gypsum was a member of a trade association called the Gypsum Association.

31fff.  As recently as 1970, defendant U. S. Gypsum demonstrated its tacit agreement with other defendant and non-defendant members of the asbestos industry to keep silent on the health hazards of asbestos.  U. S. Gypsum understood that its decision to put an asbestos warning on any of its products was a decision that had to be made by the entire industry or be subject to competitive disadvantages because each company, including U. S. Gypsum, knew that consumers would not purchase their products if they were made aware of the hazards of their asbestos content.

31ggg. The acts of the defendant conspirators, as described above, constitute a fraudulent misrepresentation which proximately caused injury to the Plaintiff's decedent in the following manner:

      (a)     The material published or caused to be published by the defendants was false and

incomplete in that the defendants knowingly failed to advise the general public including the Plaintiff's decedent of the known health hazards of asbestos and asbestos-related products.

(b)    Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos:

(1)    maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2)    assist in the continued pecuniary gain of the defendants through the sale of their products;

(3)    influence in the defendants'  favor proposed legislation to regulate asbestos exposure; and,

(4)    to provide a defense in lawsuits brought for injury resulting from asbestos disease.

(c)    Plaintiff's decedent reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products to continue his exposure to asbestos because he believed it to be safe.

(d)    Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended that Plaintiff's decedent rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue his exposure to those products.

**WHEREFORE,** Plaintiff requests judgment against each and every one of the Defendant

Asbestos Suppliers in the amount of Two Million Dollars ($2,000,000.00) compensatory damages

and Four Million Dollars ($4,000,000.00) punitive damages.

## CLAIM SEVEN - MARKET SHARE LIABILITY

32.    Plaintiff adopts and incorporates by reference all relevant paragraphs of this Complaint as

if fully set forth herein.

33.    At all times relevant hereto, the named Defendants represent substantially all those involved

in the mining and/or manufacturing and/or fabricating and/or supplying and/or distributing and/or

selling of asbestos products to which Plaintiff's decedent was exposed during the relevant time

periods. To the extent that Plaintiff's decedent may be unable to identify the actual manufacturers,

suppliers, or distributors of the specific asbestos products to which she was exposed, all named

Defendant Suppliers are liable to Plaintiff in proportion to their market share position in the industry

with reference to asbestos products. All named Defendant Asbestos Suppliers are therefore liable

to Plaintiff in such proportion under the theory of "enterprise liability" or "industry-wide liability"

set forth, among other places, in Sindell v. Abbott Laboratories, 26 Cal. 3d 588, 163 Cal. Rptr. 132,

607 P.2d 924 (1980), cert. denied 449 U.S. 921 (1980).

   **WHEREFORE,** Plaintiff requests judgment against each and every one of the Defendant

Asbestos Suppliers in the amount of Two Million Dollars ($2,000,000.00) compensatory damages

and Four Million Dollars ($4,000,000.00) punitive damages.

_____/s/_____
**EVE E. PRIETZ**
**Bar No.: 06071**
**Law Offices of Peter G. Angelos**
**A Professional Corporation**
**5905 Harford Road**
**Baltimore, Maryland 21214**
**(410) 426-3200**

**ATTORNEY FOR PLAINTIFF**

## PRAYER FOR JURY TRIAL

Plaintiffs elect to have the above-captioned case tried before a jury.


_____/s/_____
**EVE E. PRIETZ**
**Bar No.: 06071**
**Law Offices of Peter G. Angelos**
**A Professional Corporation**
**5905 Harford Road**
**Baltimore, Maryland 21214**
**(410) 426-3200**

**ATTORNEY FOR PLAINTIFF**

G:\WPFILES\2001DOCS.BSM\DOC\BSM.002

**(34)**